## Lytle *against* Mehaffy.

A seizure of goods or lands, upon an execution, or a sale of them by the sheriff, is not *ipso facto* a payment of the judgment upon which the execution issued; nor can it be considered paid until there be an actual payment, or a final appropriation of the money, so as to enable the defendant to resort by action to a co-defendant or co-surety for contribution: and in such actions the statute of limitations then only begins to run.

ERROR to the district court of *Lancaster* county.

James Mehaffy and James Duffy against Joseph Lytle, who survived John Pedan.

The parties agreed to consider the facts of this case in the nature of a special verdict; and they are thus stated and decided upon by the court below, (Hays, president.)

In the year 1813, John Pedan (now deceased) entered with Joseph Lytle, as his surety, in a bond to Mrs Frances Evans, conditioned to pay her the sum of 24,290 dollars 62½ cents. James Mehaffy, James Duffy and Henry Share were co-obligors in the same bond. A considerable portion of this debt having been discharged, John Pedan's share, the one-fourth part of the balance remaining unpaid, was ascertained to be 3616 dollars 71½ cents; and he and Joseph Lytle, on the 19th day of July 1815, executed a bond of indemnity to James Mehaffy and James Duffy, to keep them harmless, and indemnify them, their heirs, executors, &c. and his and their goods and chattels, lands and tenements, of and from all actions, suits, payments, costs, charges and damages, for or by reason of three thousand six hundred and sixteen dollars and seventy-one and a half cents, being the one-fourth of a bond, &c.

The estate of Henry Share, one of the co-obligors, was, in 1820, seized and sold by executions under the judgment obtained by Mrs Evans on her bond—who, in this way, recovered the amount which John Pedan was bound to pay, and ought to have paid her.

Henry Share having, on the 12th of May 1821, assigned his right and interest in this matter to Henry Haines, Jun., a suit was brought on the 1st of June 1827, in his name, to the use of Henry Haines, Jun., against James Mehaffy, to recover contribution from him as a co-obligor for his one-third part of the sum, which had been levied from the estate of Share, in discharge of Pedan's one-fourth of the balance of Mrs Evans's bond. In this suit, the plaintiff recovered of James Mehaffy 2546 dollars damages, with costs.

A similar suit was brought on the same day, against James Duffy, for his contributary share as a co-obligor of the same sum; and on the 25th of September 1828, a judgment was rendered by agree-

ment and consent, for the sum of 2620 dollars 21 cents, and James Duffy then assigned to Henry Haines, Jun., in satisfaction of this judgment, his claim to indemnity upon the bond of indemnity of the 19th of July 1815.

On this bond of indemnity, an action was commenced in the name of the obligees, James Mehaffy and James Duffy, for the use of James Mehaffy, to September term 1831, No. 28, and judgment therein, was recovered by the plaintiffs, for the penalty, and for the special damages of James Mehaffy.

The present suit is a *scire facias* on that judgment, issued against Joseph Lytle, who survived John Pedan, under the statute of 8 and 9 William 3,—suggesting breaches of the condition of the bond, in regard to the indemnity of James Duffy, for the purpose of recovering his, the said James Duffy's damages, by reason of such breaches. The defendant pleaded *non damnificatus*—conditions performed —and payment with leave, &c., and the *replications of conditions* not performed and *non solvit*, placed the case at issue.

It came on for trial, and after the testimony was closed, the jury were dismissed. Counsel agreeing to argue the case on the testimony before the court, as upon a special verdict, finding the facts; each party reserving exceptions to the opinion of the court, and bills of exception to the testimony: the court to give their opinion on the argument, in charge to a jury hereafter, with directions to find a verdict accordingly. This course was adopted by consent.

The argument took place; and as Joseph Lytle was not notified to appear and defend in the suit against James Duffy, for his contributary share, it was conceded that he might avail himself of the statute of limitations, if a plea of the statute would have been a bar in that suit. It was strenuously contended by his counsel, that it *would;* and this was treated as the great point in the cause—it being urged that, on this account, the plaintiff was not entitled to recover.

2. It was also contended, that he ought to recover nothing here, because he had no notice of that suit.

3. That he ought not to recover, because the judgment in that suit, and the assignment, were a fraud upon Joseph Lytle.

4. That the plaintiff ought not to recover, because Duffy paid nothing, was insolvent, and therefore was not and could not be damnified: or if the plaintiff be entitled to recover at all, the damages should be nominal.

On the other side, it was contended that the statute would not, if pleaded, have been a bar to the action of Share *et al. v.* Duffy—that the plaintiff was entitled to sue and recover, and that there was neither irregularity nor *mala fides* in the judgment or in the assignment—that as Duffy was entitled to full indemnity, and as the conditions of the bond of indemnity had been broken, and all indemnity withheld, the measure of damages in this case should be the full amount of his one-third part of the sum paid by Share for

[Lytle v. Mehaffy.]

Pedan, with interest from the 26th of June 1821, when the money was paid to Mrs Evans, until this time—with one-third of the costs on the *venditioni,* against Share, and interest thereon: and the costs in the suit to June term 1820, No. 90.

The first question is, would the statute of limitations have barred the action against Duffy for his contributary share of Pedan's part of the obligation to Mrs Evans?

The material consideration with reference to this question, is the time when the cause of action accrued to Henry Share. On the part of the defendant it was argued, that the acknowledgment of the sheriff's deed, was the point of time—then it was that he must be considered as having paid Mrs Evans, for then his title to his land was completely divested. For the plaintiff, it was insisted, that Share's action did not accrue, until the court finally decreed what part of the money arising from that sale which had been paid in, Mrs Evans was to receive, and that as this was not decreed until the 26th of June 1821, he could not have sued his co-obligors before that date.

The case of the Bank of Pennsylvania *v.* Winger, 1 *Rawle* 302, decides that a sale of land on execution does not discharge the debt. It is not payment, either in fact or by presumption of law.

The payment of a debt, considered as a matter of fact, implies the receipt of the money by the creditor, as well as the parting with it, by the debtor. The money raised by the sale of Share's estate, was in pursuance of a rule brought into court by the sheriff, on the 16th of January 1821. The debt of Mrs Evans was not paid by the sale of the land or the receipt of the purchase-money by the sheriff, which the *sale* implies.

The sheriff was the agent of the law and the court, to carry into effect their judgments. He was no more the plaintiff's agent than he was the agent of any other of the defendant's lien creditors, or of the defendant himself. His liability to be called upon, as he was, to pay the money into court, proves that in legal contemplation, as well as in point of fact, his receipt of it was no payment to the plaintiff, Mrs Evans. And he was thus liable, at the instance of the defendant, as well as that of any of his creditors, claiming a lien, or who chose to contest Mrs Evans' right to the proceeds of the sale; all which confirms the position, that the receipt of those proceeds by him was no payment to the plaintiff, in the execution.

Nor did the bringing of the money into court, on the 16th of January 1821, in obedience to the rule, constitute a payment to Mrs Evans.

There can be no presumption of law to that effect, for it would involve the absurdity that she was paid nearly twice as much as she demanded—the sum paid in being 16,000 dollars, and her claim being something more than 9000 dollars:—again, it would be a presumption against the record which shows that a part of her claim was not paid until the 27th of January, and the residue

[Lytle v. Mehaffy.]

not until the 26th of the ensuing June. But further, the fact of ordering the money into court, and that too upon the motion of Mr Rogers, who was concerned for other creditors of Share, shows that Mrs Evans's right to it was contested. Though the estate was sold upon her execution, she was not entitled to the proceeds, as a matter of course. They might all have been appropriated to prior liens, had there been such, and she might have waived her lien without relinquishing her debt. Hence, the sale was no payment to her, and much less the bringing of money into court.

And whilst the contest was pending before the court and the money detained from her, and placed *in gremio legis* to abide the event, any supposed presumption of payment to Mrs Evans is manifestly negatived.

On the 27th of January the court decided in her favour to the amount of 6000 dollars of her claim, which sum was then ordered to be paid to her. But it was not until the 26th of June 1821, that they directed the balance, being 3322 dollars 43½ cents, to be paid. It was not until this last-mentioned day that Mrs Evans did in fact or by any legal intendment receive the whole of her debt—not until then was she paid—not until then was it decided that she was entitled to be paid her whole demand.

Could Henry Share have brought his suit for contribution against his co-obligors, Mehaffy and Duffy, before that day? The amount of Mrs Evans's debt was more than 9000 dollars. Had Share sued for contribution after the 6000 dollars were ordered to be paid to Mrs Evans, but before the remaining 3322 dollars 43½ cents were ordered to be paid to her, could he have sustained his action? How could he have shown (what would have been incumbent upon him) that he had paid Pedan's part of the bond? Would the receipt of Mrs Evans of the sum of 6000 dollars have sufficed, when more than 3000 dollars of her bond were still unpaid? Would the payment to her of the 6000 dollars have established his claim to contribution?

It must be recollected that the arrangement with respect to Pedan's part of the obligation, was a transaction in which the obligee had no concern. Her claim was upon each and all the obligors, none of whom had any right to say to her, on payment of a part of the debt, that such payment was to be considered as the share of this or that obligor. Her demand was a solid debt, not to be parcelled out, or in any way divided. Whatever was paid, in part, was so much taken from the entire debt, and so much the less remained to be recovered by the obligee from the obligors, Pedan, Mehaffy, Duffy and Share; therefore, when the 6000 dollars were paid, she was still entitled to have of all and each of those obligors, Pedan, Mehaffy, Duffy and Share, the residue of 3322 dollars 43½ cents.

The consequence is, that if Henry Share had brought his suit for contribution before the payment of this last-mentioned sum, he could

[Lytle v. Mehaffy.]

not have proved that he had paid the whole of Pedan's part of the bond—he could, at the most, have shown that he had a portion of it only; and had he sued for Duffy's contributary share of one-third of the amount of Pedan's part of the bond, on the ground of having paid such amount to Mrs Evans, he must have failed, since the cause of his action did not accrue until she received the sum paid to her, on the 26th of June 1821, and the balance due on her judgment. The right to contribution, as it was alleged and set forth in Henry Share's suit against Duffy, was an *entire demand,* and as this right was not complete until the last payment to Mrs Evans was made, I am of opinion that the action for the same did not accrue to Henry Share until the 26th of June 1821.

The suit in his name against James Duffy to June term 1827, No. 90, having been commenced on the 1st of June 1827, was brought within six years after the cause of action accrued: and the act of limitations, if pleaded, would have been no bar.

The second ground of defence is, that Joseph Lytle had no notice of the suit against Duffy for his contributary share, and that, therefore, the plaintiff here ought not to recover. This conclusion cannot be sustained. The circumstance would be a good ground of objection to the judgment in that case, were it presented as an estoppel or evidence concluding the defendants here; but if it be shown that Henry Share had a sufficient cause of action and was entitled to recover from James Duffy contribution for his share of John Pedan's portion of Mrs Evans's bond, the fact of his recovery is available in the suit upon the bond of indemnity, though Joseph Lytle was not warned by James Duffy, or called upon to defend the other suit. Now, Henry Share having paid John Pedan's part of the bond due to Mrs Evans, was entitled thereupon to have and demand of James Duffy, a co-obligor, his contributary proportion of such part; and thus a sufficient cause of action againt James Duffy is manifest.

The third ground is, that the plaintiff ought not to recover, because the judgment in Share *et al. v.* Duffy, and the assignment of the claim of indemnity by the latter, were a fraud upon Joseph Lytle. No fraud, in fact, has been suggested: but the confession of judgment and the assignment of Duffy's interest in the bond of indemnity are asserted to be a fraud in law. In point of law, however, there is nothing irregular in the confession of judgment by J. Duffy, or in the assignment. With respect to the judgment, it does not appear he had, or could have any defence against Henry Share's demand of contribution, and the judgment was therefore proper, and indeed unavoidable. As to the assignment, James Duffy had a perfect right to make it, and having made it for the purpose of obtaining satisfaction of the judgment against him at the suit of Henry Share, the consideration is abundantly sufficient. It is to be observed, that by this bond of indemnity, John Pedan and Joseph Lytle appear to have considered and treated James Mehaffy and

[Lytle v. Mehaffy.]

James Duffy as sureties. The probability, deducible from the fact of giving it, is, that it was not expected then that Pedan would be, able to pay Mrs Evans the 3616 dollars 71 cents which he was bound to pay her: but it was believed that this duty would devolve in the whole or in part upon his co-obligors, Mehaffy and Duffy. On no other supposition is it explicable why such a bond should have been given to them, and a similar one not taken from them at the same time. For if they all stood on equal ground in regard to their ability to pay, Pedan had as much right to a bond of indemnity from them as they had to one from him. Although Joseph Lytle was, in the first instance, a surety for Pedan merely, yet by executing this bond of indemnity, Pedan and he placed themselves in the position of principals, and Mehaffy and Duffy in that of their sureties. This view of the case may be important in several respects, but it strikes me as material in relation to the allegations by which the defendant has attempted to support the third ground of his defence, and to the cases of Miller *v. Howey*, 3 *Term Rep.* 3, 4, and Touissant *v.* Martinnant, 2 *Term Rep.* 100, which become applicable to the transaction in this light.

I think the defendant has failed to sustain this ground of his defence.

The fourth and last ground is, that the plaintiff ought not to recover, because Duffy paid nothing, was insolvent, and was not and could not be damnified: or, if the plaintiff be entitled to recover at all, the damages should be nominal. These are precisely the objections that were overruled by the supreme court in the case of the Harrisburg Bank *v.* Douglass, in 4 *Watts* 95. Douglass had drawn two notes, which were endorsed by Parsons, to the Bank, and to indemnify his endorser, gave him a judgment for 4000 dollars. Both parties (drawer and endorser) became embarrassed; the notes were not paid, and in December, 1834, Parsons assigned this judgment to the Bank. Afterwards, in February 1835, the Bank obtained judgment against Parsons as endorser. "The assignee of Parsons," it was said, "can be in no better situation than Parsons. Parsons having paid nothing, could not recover more than would be necessary to indemnify him for the judgment obtained against him. This could be only nominal; but his insolvency makes it improbable that he will actually pay any thing." All these positions, which were taken by the court below, were overturned by the supreme court, who held that neither the Bank nor the surety was bound to wait till the surety was actually prejudiced by the default of the principal. The principal was bound to keep the surety not only indemnified but unmolested. The court below erred in thinking the bond could not be enforced before the surety was prejudiced, and that the right of the Bank might be effected by the equities between him and his principal." This determination runs with the current of authorities. Putting the obligee in danger of being arrested is a damnification. See Miller *v. Howey*,

and the case there cited; and Ross's Executors *v.* Rittenhouse, 1 *Yeates* 460, with the authorities there cited and referred to.

Is there any material difference between the case of the Bank *v.* Douglass, and that under consideration? I conceive there is not. The bank stood to Parsons and Douglass as Henry Share did to Duffy and Pedan—Share had paid Pedan's debt, and Pedan, had he been able, must have repaid him; as Douglass, had he been able, must have paid the bank. Duffy was liable to pay Share, on account of his payment of Pedan's debt, and to indemnify him against this liability, Pedan and Lytle entered into the bond now under consideration—just as Douglass gave Parsons that judgment. to indemnify him against the liability of his endorsement. Share having sued Duffy on his liability, and obtained judgment, the latter, to satisfy this judgment, assigned his interest to Share, in the bond of Pedan and Lytle—Parsons assigned to the bank his judgment against Douglass, though before the bank had obtained judg-. ment against him on his endorsement. Was Duffy insolvent? So was Parsons. Had Duffy paid nothing? So had not Parsons. But the idea that nominal damages only. were on these grounds recoverable by his assignee, the bank, was repudiated by the supreme court; and it was held that the judgment assigned was available to the full extent of the bank's demands for the note it had discounted. In short, the only considerable difference between the cases, (and this is one I think by no means essential,) is that in The Bank *v.* Douglass, the subject assigned was a judgment for indemnity, whereas, in the present case, it was a bond of indemnity, though judgment has since been rendered upon it. I say I do not regard this difference as essential, because the damnification of Duffy was complete, not only by the judgment in the suit of Henry Share, &c. against him, but by the commencement of that action.

With this opinion of the grounds of defence, it only remains to consider the measure of damages which the plaintiff is entitled to recover; and from what has been said; it follows that he is entitled to recover that proportion of John Pedan's debt paid by H. Share, which James Duffy was bound to contribute, with interest, deducting the sum of 1000 dollars, paid by Joseph Lytle, on the 15th of August 1818, and adding the one-third of the costs of the *vendi-tioni exponas* against Share, with interest, and the costs in the suit to June term 1827, No. 90. The amount is 2706 dollars 70 cents, which sum I think the plaintiff is entitled to recover as his damages in this case.

*Norris* and *Jenkins,* for plaintiff in error, referred to the report of the original case, out of which the present one arose; 2 *Penn. Rep.* 361; and contended that the seizure of goods or the sale of lands was, in law, a satisfaction of the judgment; and on this point cited 12 *Serg. & Rawle* 41; 4 *Mass. Rep.* 403; 1 *Baker* 207; 2 *Tidd's Pract.* 937; 17 *Serg. & Rawle* 236; 2 *Lord Raym.* 1072;

[Lytle v. Mehaffy.]

2 *Johns. Rep.* 429; 12 *Johns. Rep.* 208; 4 *Watts* 124; 3 *Rawle* 401; 1 *Rawle* 295. The sheriff is not the agent of the plaintiff, but the agent of the law; 3 *Binn.* 64; 8 *Serg. & Rawle* 327; 11 *Serg. & Rawle* 139; and when he makes the money, is bound to appropriate it to the payment of the liens according to priority; and he may sue for the purchase-money if not paid to him, and recover interest upon it. 1 *Penn. Rep.* 44; 14 *Serg. & Rawle* 257; 4 *Watts* 296; 7 *Serg. & Rawle* 197; 3 *Whart.* 119; 5 *Watts* 515; 1 *Penn. Rep.* 402, 240; 7 *Watts* 475. That the sale of the property is a payment of the judgment, is argued from the fact that the interest upon the debt ceases upon the return day of the execution. 6 *Watts* 96; 4 *Watts* 71; 5 *Watts* 511. When a surety pays the debt of the principal, that moment the statute commences to run. 1 *Penn. Rep.* 140.

*Montgomery* and *Ellmaker, contra.* Upon a sale on an execution, the party may compel the sheriff to bring the money into court for appropriation, and while there, it is *sub judice;* and the plaintiff in the judgment can not take it out of court, nor is there any legal fiction which considers it his, or any one else but the defendant's, until it has passed in *rem judicatam;* and if the defendant be a surety or a co-defendant, having a right of action for contribution, he can not successfully commence it before actual payment or appropriation. 1 *Wash. C. C. Rep.* 278; 6 *Watts* 221; 2 *Rawle* 128. The statute will not begin to run until the cause of action be complete. 1 *Whart. Rep.* 292; 1 *Penn. Rep.* 492; 3 *Rawle* 381, 389; 8 *Johns. Rep.* 406; 17 *Serg. & Rawle* 436.

The opinion of the Court was delivered by

KENNEDY, J.—The various positions affirmed and laid down by the court below, which have been excepted to in this case, are all, as we conceive, perfectly correct and tenable; most of them are so plain to the legal mind as to be self-evident, and therefore require no argument to be made or reasons to be adduced in order to establish or make them more so. What, however, is said in regard to the statute of limitations and some other matters, not being a bar, or interposing an obstacle to the recovery of the plaintiff, seem from their nature and unfrequent occurrence to claim some notice.

Cases, in relation to the execution of judgments, have been referred to by the counsel for the plaintiff in error, to show that the mere seizure of the defendant's goods without *more,* amounts to a satisfaction of the judgment; whence, it was said, it might be inferred, that, as soon as the goods of a surety were seized, by virtue of an execution, for the debt of his principal, he might maintain an action against his principal. But suppose he were to commence such action immediately upon the seizure of his goods, and they, being of a perishable nature, were to die without any neglect, want of care or vigilance on the part of the officer, before they

[Lytle v. Mehaffy.]

could, by a sale, be converted into money, what would become of the action? Will it be said that it could be maintained? It was said that the reason why a bare seizure amounted to a satisfaction of the debt, was, because the defendant in the execution thereby lost his goods and became divested of his property in them. But this, I apprehend, is not so to the full extent claimed; for it has never been said, much less adjudged, that the officer, the creditor, or any body else becomes vested, by means of the seizure alone, with the absolute property in the goods. If the seizure, then, does not change or vest the absolute property in some other person than the defendant in the execution, it must, of course, still remain in him; and no doubt it does until a sale is made, by the officer, of the goods, which transfers and vests the whole right of property in the purchaser at the sale. The officer, by the seizure under the execution, acquires merely a special property in the goods, which would enable him to maintain trespass or trover for them if improperly taken from him; and under the authority of the law, he is invested with full power to sell and transfer the absolute property in them; and this is the full extent of all that belongs to him. It is only a power coupled with an interest at most, that the officer has over the goods, because a payment or tender of the money to him at any time before he has effected a sale of them, will divest him of all right in and authority over them. Therefore, when it is said that the seizure of a defendant's personal property, by virtue of an execution against him, either divests him of his right of property therein, or amounts to a satisfaction of the debt, it must be understood to be so only *sub modo*, in a qualified and limited sense. And I take it, that it would not be very prudent or safe for a surety to commence a suit against his principal to recover the debt from him, merely because his goods had been taken in execution for it, without any sale having been made of them, or allowing a proper lapse of time for that purpose. When the sale, however, is made and the money thereby raised, there can be no possible difficulty about the appropriation of it; for if there be only one execution, the money must necessarily be first applied to the satisfaction of it, so that the party in whose favour it was sued out is entitled to so much of the money as will satisfy his debt, and no other can claim it; and if there be two or more executions against the same defendant, returnable to the same term, and put into the hands of the officer on different days, then the money must be applied towards the discharge of them according to the order of time in which they were delivered to the officer, by paying first the one first delivered, &c., &c. It is considered the ordinary duty of the officer to do this, though the sheriff, by the terms of the execution, is commanded to have the money in court at the return day of it. But cases may occur, perhaps, where the court would take charge of the money and direct the appropriation of it; as, for instance, where the money is insufficient to satisfy all the executions, and application is made

[*Lytle v. Mehaffy.*]

to the court to order the sheriff to bring it into court, by some of those who delivered their executions last to the sheriff, in order that they may have the money applied to the discharge of them, on the ground, that the executions delivered before theirs to the sheriff, were issued by collusion between the defendant and the plaintiffs therein named, for the purpose of defrauding the applicants or others, who are *bona fide* creditors of the defendant.

But there is certainly a great difference between the seizure of real estate and that of personal, under an execution. In the latter case, the seizure secures the application of the money that shall arise from the sale, almost to a certainty, to the discharge of the debt or claim contained in the execution, under which the seizure is made. But in the case of real estate, the seizure is nothing in this respect; and after a sale shall be made of the estate, gives no preference to the money whatever, where liens existed at the time of the sale against the estate of equal or prior date to that connected with the execution under which the seizure was made. The money must be applied to the discharge of the lien-debts, according to their seniority of lien, excepting when a mortgage-debt happens to be the first lien, which, under the act of assembly, in that behalf, still remains a lien upon the estate, notwithstanding the sale. But the application of the money, in such cases, is often a very difficult and complicated task, requiring much more legal knowledge than most of the sheriffs possess, or are capable of exercising. But in no case are they compellable to encounter the difficulty and responsibility attending it, because they may get clear of it by voluntarily bringing the money into court; or any person laying claim to the money, or any part of it, may compel the sheriff, by an order of the court, to which he is entitled upon application, to bring the money into court. The money being thus brought into court, cannot be taken out without an order of the court authorising it. This the court, under the acts of assembly, is bound to make in favour of whoever shall show himself entitled to it. But before such order or decree can be made, the claims of the parties respectively must be examined into, as also all the records, where liens against the estate may be registered and discovered, if any such shall exist; and this ought to be done, notwithstanding the persons entitled to them shall fail or neglect to bring them forward and make them known. This of course will necessarily require time, and the court must be left to judge of the time requisite for this purpose. And after an examination is gone into and had by the court, it may be discovered that there was really no good reason or even colour of ground for objecting to the plaintiff's receiving the money, under whose execution the sale was made and the money raised; but then it is clear that this could not be ascertained and made known without an examination, for which it was proper to allow time. Is it not clear, then, that, until the question as to the appropriation of the money has been passed on by the court,

[Lytle v. Mehaffy.]

the right of the execution creditor to the money, cannot be considered as established or determined? But if the decision as to the appropriation of the money, lie in the common pleas or district court, any one of the persons concerned, has a right to carry it to the supreme court by appeal, so that a very considerable lapse of time may take place before a final determination of the question can be obtained. But surely until then the party in whose favour the decision is made, whether the execution creditor or another, cannot be said to have any right to take the money out of court; and if by any chance he were afforded the opportunity of laying his hands upon it and taking it, he would not be justified in doing so, without the license of the court. Would it not, then, be perfectly incongruous to hold that he was paid the amount of his debt with money that he had no right to touch, take, or make use of in any way whatever? It is unlike the case of money made by a levy on personal property, where the law makes an appropriation of it, and authorises the plaintiff to take it without any decision of the court, and for which he may sue the sheriff without any application to the court. And although it may happen, in such latter case occasionally, that he cannot always receive it as soon as it shall be made, owing to the conduct of the officer in improperly withholding it from him,—yet in law he is considered as entitled to it by a right that is in no wise questionable. But again, when the question as to the appropriation of the money is made in court, in case of money arising from real estate, it must be considered uncertain, until it shall be determined by the court, who the party is that is entitled to receive it; because that is the very thing which is placed in doubt, and made the cause of its having been brought into court, and which can only be ascertained and rendered certain by a judicial determination. This, however, is not all—the act of assembly has made it the duty of that court alone, where the money is, to order and direct the appropriation of it; and no other court can take cognizance of it, nor undertake to decide in any way whatever, either directly or collaterally, to whom the money belongs, or who is entitled to it, until after such court shall have decided upon it, when the question may be brought by appeal before this court; but in no other way can this court acquire jusrisdiction of the matter and decide upon it. This court has no authority to decide on the matter collaterally, nor can it review the decision of the court; because in a collateral action, as here, the decision of the court below is final and conclusive, when unappealed from. Nor can the court, where the money remains, decide on the question of its appropriation in any collateral action; it must and can only be done upon a direct application to it, by one or more of the parties interested, for that purpose. It is clear, therefore, that the money cannot, either in fact or in law, be considered as paid to a party who has not actually received it, and whose right to receive it is contested, and made the subject of future judicial determination. Does it not,

VIII.—Y*

then, necessarily follow, that as long as the creditors cannot be said to have been paid, either in fact or in contemplation of law, his debtor cannot be considered as having paid the debt? That the debtor has no right in such case to be regarded as having paid the debt to his creditor, whose right to receive the money is contested, until it shall be judicially determined in favour of the latter, is, as would appear, almost if not quite, self-evident. From this course of reasoning, and the principles established by it, we are brought to the conclusion that Henry Share cannot be considered as having paid any money to Mrs Evans for John Pedan before the 26th of June 1821, when the court ordered the 3322 dollars 43½ cents to be paid to her out of the moneys in court arising from the sale of Share's real estate. That until then Share had no right to bring, and could not maintain an action for contribution; that the statute of limitations did not begin to run until his right of action accrued; and his action afterwards against Duffy for contribution being commenced on the first of June 1827, could not be barred by the statute of limitations, as the six years had not then run from the time of paying the money.

It was, however, further contended by the counsel for the plaintiff in error, on the argument, that part of the six thousand dollars, ordered by the court, on the 27th of January 1821, to be paid to Mrs Evans out of the same money, ought to be considered as having been paid by Share in discharge of part of Pedan's proportion of the debt due to Mrs Evans, which Duffy, as a co-principal obligor with Share, was bound to pay, on account of the insolvency of Pedan; and that as to this part so paid, the statute had clearly run, and was therefore a bar. But there is no ground for this argument, because it is based upon the assumption of a fact, which does not appear to exist or be supported by the evidence. On the contrary, it would seem that the six thousand dollars, so ordered to be paid, were not even equal to the sum which Share was bound to pay, as between himself and his solvent co-obligors, in discharge of his own original proportion of the debt, together with that which devolved upon him on account of Pedan's insolvency. But until he paid something above this amount, it is clear he could have no claim to contribution; because he could not be said to have paid any thing that Duffy was bound to Share, either in law or equity to pay, or to keep him indemnified against paying. On the contrary, Share was bound in equity, as between himself and Duffy, to pay that amount to Mrs Evans, and thus protect Duffy from paying it; so that until the court, on the 26th of June 1821, ordered the 3322 dollars 43½ cents to be paid to Mrs Evans, Share could not be said to have paid more than his own proportion, as between him and Duffy, and consequently had no cause of action against, or right to sue the latter for contribution. Share had it not in his power, even had he been willing, to have appropriated any portion of the six thousand dollars otherwise than to the payment of his own propor-

[Lytle v. Mehaffy.]

tional share, as between himself, Duffy and Mehaffy, his solvent co-obligors of the debt coming to Mrs Evans. Because it is obvious if he were permitted to do so, and upon that ground to maintain suit against each of them for contribution, he might recover against them, leaving them still liable, as co-obligors, to pay his proportion of the debt to Mrs Evans, which would be manifestly unjust if not absurd. Hence all that was said and urged on the argument, upon the ground of Share's having made such appropriation, by the terms of his assignment to Haines, when fairly construed, can avail nothing.

As to the question, whether the bringing of the action by Share against Duffy, was such a damage to the latter as to amount to a breach of the condition of the bond given by Lytle and Pedan to Duffy and Mehaffy, we are clearly of opinion that it was; because, by the very terms of it, the former were bound to *indemnify* the latter against all actions, suits, &c.; but through the neglect and failure of Pedan and Lytle, Duffy had not only been sued, but had actually been rendered liable to pay the amount of money demanded of him on the action; and by being sued was, in contemplation of law, actually damnified; and being rendered liable to the amount claimed, nothing short of a recovery in this action, equal to that sum, for which he had so become liable to Share, could be considered a complete *indemnity*.

But it was objected that Duffy was not liable to reimburse Share the one-third, or any part of Pedan's portion of the debt which he paid. It is difficult to perceive any plausible ground upon which this objection can be sustained. Share, Mehaffy, Duffy and Pedan were principal obligors in the bond, securing the payment of a debt created for their mutual benefit; and being bound jointly and severally by the bond for the payment of it, are regarded in equity as surety between themselves for each other, so that if any one of them paid more than his proportion, the others were bound in equity and law here to reimburse him if able: but if any of them should become insolvent and unable to pay, and a loss should arise therefrom, it was to be borne equally by those of them who should remain solvent. Accordingly, Pedan having become insolvent and unable to pay, and Share having paid the whole of his proportion, whereby a loss accrued to Share, which Mehaffy and Duffy, being solvent, were bound to bear their equal proportion of, that is one-third thereof, rendered Duffy liable, so that he could not resist the claim for which he was sued by Share.

Judgment affirmed.